Jeffrey W. Herrmann
COHN LIFLAND PEARLMAN
 HERRMANN & KNOPF LLP
Park 80 West-Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
201-845-9600
jwh@njlawfirm.com

*Counsel for Plaintiffs and the Class*

Of Counsel:
Patricia I. Avery
Timothy Brennan
WOLF POPPER LLP
845 Third Avenue, 12th Floor
New York, NY 10022
Telephone:  (212) 759-4600
pavery@wolfpopper.com
tbrennan@wolfpopper.com

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DONALD DUNN and NICOLE DUNN, on behalf of themselves and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PHH MORTGAGE CORPORATION d/b/a PHH MORTGAGE SERVICES,<br><br>Defendant. | Civil Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>CLASS ACTION</u>**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Donald Dunn and Nicole Dunn, by their attorneys, on behalf of themselves and the Class set forth below, allege the following upon information and belief, except for those allegations that pertain to Plaintiffs, which are based on personal knowledge:

## NATURE OF THE ACTION

1. Plaintiffs bring this class action against PHH Mortgage Corporation (hereinafter, "Defendant," the "loan servicer," or "PHH") for its systematic violations of the Truth in Lending Act of 1968, as amended ("TILA"), 15 U.S.C. § 1601 *et seq.*, Regulation Z, adopted pursuant to TILA, and the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. § 56:8-1, *et seq.*, for failing to provide homeowners with an accurate statement regarding the mortgages that it services.

2. Specifically, Defendant has an obligation to prepare "payoff statements" that set forth the amounts required to fully satisfy all obligations secured by the loan serviced by Defendant.  These payoff statements include information such as the outstanding principal balance, outstanding interest, amounts held in escrow, fees associated with the account, and projected interest if the amount due is paid in full by a certain date.  However, while the loan servicer provides detailed listings for the homeowners' debts, it omits any reference to a category of funds that can be credited to the loan:  proceeds from property insurance claims.  These insurance proceeds—which, as in the case of Plaintiffs, can be tens of thousands of dollars—are purportedly held in a "restricted escrow account" until the loan servicer either uses the funds to repair any property damage to the house or reduces the balance on the loan.  But they do not appear, as they should, on the payoff statements.

3. Defendant's failure to account for such funds had the effect of overstating and exaggerating the obligations of Plaintiffs and the members of the Class under their respective mortgage agreements.  Defendant's conduct has prejudiced Plaintiffs and the members of the Class because the payoff statements are the foundational documents for many critical events, including loan modification, the sale of property, and in foreclosure proceedings.

4. As a direct result of Defendant's delay in producing an accurate payoff statement, Plaintiffs were delayed in selling their home and incurred additional expenses in so

doing, including the payment of property insurance, property tax, and interest payments that they would not otherwise have had to pay had Defendant properly included the insurance proceeds in the payoff statements.

## PARTIES

5. Plaintiffs reside in the State of Maryland.

6. Defendant PHH Mortgage Corporation provides mortgage financing solutions, loan subservicing, and relocation services. Defendant's principal place of business is in Mount Laurel, New Jersey. It is a wholly-owned subsidiary of Ocwen Financial Corporation ("Ocwen").

7. Defendant is a "servicer" as defined by TILA and Regulation Z. *See* 15 U.S.C. § 1602(g); 12 C.F.R. 1026.36(c).

8. Defendant was the servicer of Plaintiff's mortgage loan at pertinent times alleged herein for the property located at 5310 Peppertree Court, Panama City, FL 32404.

## JURISDICTION AND VENUE

9. This Court has original jurisdiction over this class action pursuant to 28 U.S.C. § 1331.

10. Venue is proper pursuant to 28 U.S.C. § 1391 because Defendant is subject to jurisdiction and regularly conducts business in this District.

## THE TRUTH IN LENDING ACT ("TILA") AND REGULATION Z

11. The purpose of TILA is, among other things, "to protect the consumer against inaccurate and unfair credit billing . . . practices." 15 U.S.C. § 1601(a).

12. As TILA is a consumer protection statute, it must be construed liberally and broadly in order to best serve Congressional intent.

13. Those bound by TILA and its implementing regulations are obligated to discharge their obligations with absolute compliance.

14. A "servicer," as pertinent here, is

> a person responsible for the servicing of a federally related mortgage loan (including the person who makes or holds such loan if such person also services the loan). Servicing means receiving any scheduled periodic payments from a borrower pursuant to the terms

2

> of any federally related mortgage loan, including amounts for escrow accounts under section 10 of RESPA [*Real Estate Settlement Procedures Act*] (12 U.S.C. 2609),
>
> \* \* \*
>
> and making the payments to the owner of the loan or other third parties of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the mortgage servicing loan documents or servicing contract.

12 CFR § 1024.2(b).

15. A consumer's need to be fairly apprised of his rights under a credit agreement is most acute when a lender maintains a security interest over his and his family's residence. It is against this backdrop that Congress empowered the Board of Governors of the Federal Reserve System (the "Board") to "prohibit acts or practices in connection with . . . mortgage loans that [it] finds to be unfair, deceptive, or designed to evade the provisions of this section[.]"

15 U.S.C. § 1639.

16. In connection with this authority, and in its effort to curb "abusive servicing practices[,]" the Board in 2008 proposed regulations prohibiting loan servicers "from failing to provide, within a reasonable time after receiving a request from the consumer or any person acting on behalf of the consumer, an accurate statement of the full amount required to pay the obligation in full as of a specified date." 73 Fed. Reg. 1672, 1703 (Jan. 9, 2008).

17. The Board expressed concern regarding

> the misalignment of incentives between consumers, servicers, and investors. Servicers contract directly with investors, and consumers are not a party to the contract. The investor is principally concerned with maximizing returns on the mortgage loans. So long as returns are maximized, the investor may be indifferent to the fees the servicer charges the borrower. Consumers do not have the ability to shop for servicers and have no ability to change servicers (without refinancing). As a result, servicers do not compete in any direct sense for consumers. Thus, there may not be sufficient market pressure on servicers to ensure competitive practices.
>
> [S]ervicers may not timely credit, or may misapply, payments, resulting in improper late fees. . . . The Board is also concerned about the transparency of servicer fees and charges, especially because consumers may have no notices of such charges prior to their assessment. Consumers may be faced with charges that are confusing, excessive, or cannot easily be linked to a particular service. ***In addition, servicers may fail to provide payoff statements in a timely fashion...***

*Id.* at 1702 (emphasis added).

3

18. The inverse of the Board's reasoning is equally true: just as servicers have an incentive to disclose fees and charges in the least transparent method possible, they are equally disinclined to notify consumers of the availability of funds, such as insurance payments, which may be credited in their favor.

19. In 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), 12 U.S.C. § 5301 *et seq.*, which established the Consumer Financial Protection Bureau ("CFPB"). As part of the Act, it amended 15 U.S.C. § 1639 to empower the CFPB, in place of the Board, to "prohibit acts or practices in connection with . . . mortgage loans that the Bureau finds to be unfair, deceptive, or designed to evade the provisions of this section[.]" 15 U.S.C. § 1639(p)(2).

20. The Board promulgated regulations concerning payoff statements, which exist today in Regulation Z:

> In connection with a consumer credit transaction secured by a consumer's dwelling, a creditor, assignee or servicer, as applicable, must provide an accurate statement of the total outstanding balance that would be required to pay the consumer's obligation in full as of a specified date.

12 C.F.R. 1026.36(c)(3).

21. Also as part of Dodd-Frank amendments to TILA, Congress enacted Section 129G, which, in substance, codifies the requirement to provide accurate payoff statements:

> A creditor or servicer of a home loan shall send an accurate payoff balance within a reasonable time, but in no case more than 7 business days, after the receipt of a written request for such balance from or on behalf of the borrower.

15 U.S.C. § 1639g.

22. In its Official Interpretations, the CFPB states it "believes payoff statements should be issued according to the best information available at the time[.]" 78 Fed. Reg. 10902, 10958 (February 14, 2013).

23. Violators of TILA are liable, among other things, for

- any resultant actual damages (15 U.S.C. § 1640(a)(1));
- statutory damages,

4

- o in individual actions not less than $400 or greater than $4,000 (15 U.S.C. § 1640(a)(2)(A)(iv)),
- o in class actions, the lesser of $1 million or 1 per centum of the net worth of the creditor (15 U.S.C. § 1640(a)(2)(B); and
- costs and attorneys' fees (15 U.S.C. § 1640(a)(3).

### NEW JERSEY CONSUMER FRAUD ACT ("NJCFA")

24. The NJCFA was enacted to protect consumers against fraudulent and unconscionable practices in the sale of consumer goods and services. The Legislative intent behind the NJCFA's passage shows a clear intent that its provisions are to be applied broadly in order to accomplish its remedial purpose – the elimination of consumer fraud.

25. The NJCFA makes unlawful any "act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation … in connection with the sale or advertisement of any merchandise or real estate." N.J.S.A. § 56:8-2.

26. To state a claim under NJCFA, a plaintiff must allege (1) unlawful conduct by a defendant; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal relationship between the defendant's unlawful conduct and the plaintiff's ascertainable loss.

27. An affirmative act, such as unconscionable commercial practices or deception, constitutes a violation of the NJCFA. Further, as a result of Defendant's violating federal law, TILA and Regulation Z, the actions of PHH set forth in this Complaint herein constitute an unconscionable commercial act.

28. In a claim based on an affirmative act or representation, neither an intent to deceive by a defendant nor actual reliance by the plaintiff need to be shown. Rather, a plaintiff must plead a causal nexus between the alleged act of consumer fraud and the damages sustained.

29. A consumer must demonstrate that he or she suffered an ascertainable loss as a result of the alleged unlawful practice.

30.     Once a plaintiff proves both unlawful practices under NJCFA and the resulting ascertainable loss, an award of treble damages and attorneys' fees is mandatory.

## FACTUAL ALLEGATIONS

**Defendant's Rights Under the Mortgage to Administer Insurance Proceeds**

31.     On or about May 18, 2009, Plaintiffs took out a mortgage, secured by their residential property, located at 5310 Peppertree Court, Panama City, Florida 32404 ("the Property"), for the principal amount of $135,042.00 ("the Mortgage").

32.     Section Five of the Mortgage, entitled "Property Insurance," requires the Borrower to maintain property insurance, "in the amounts (including deductible levels) and for the periods that Lender requires."

33.     Section Five further states:

> Unless Lender and Borrower otherwise agree in writing, any insurance proceeds…shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened…if the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

34.     The above clause establishes that the Lender is required to use the insurance payments to repair the property or reduce the Borrower's indebtedness.  The Bank's retention of insurance payments for any other reason, or for no discernible reason whatsoever, is strictly prohibited.

**Defendant Deposits Plaintiff's Insurance Payments**

35.     On or about October 10, 2018, Plaintiff's Property suffered significant property damage as a result of Hurricane Michael.  Shortly after the Hurricane, Ocwen offered Plaintiffs a repayment plan providing for a three-month suspension of monthly payments until January 2019. Plaintiffs made the January 2019 payment as required.  The mortgage was then transferred to PHH Mortgage Services, which cancelled the payment plan and instructed Plaintiffs to apply for a modification of the loan.  Plaintiffs submitted a completed modification application and provided PHH with the documents it requested.  PHH denied the modification

6

and Plaintiffs appealed the denial and prevailed in the appeal. During this delay, Plaintiffs decided to sell the property.

36. Plaintiffs submitted a claim for the Hurricane damage to their insurance company which thereafter issued a series of checks jointly payable to Plaintiffs and Defendant.

37. Defendant deposited into its account $88,250.70 in insurance checks.

38. Between the months of March and July 2019, Defendant sent Plaintiffs five checks totaling $42,895.56. Defendant retained a balance of $45,355.14, which it did not further disburse for repairs of the Property or credit to Plaintiffs' indebtedness.

**Defendant's inaccurate and unlawful payoff statements**

39. By the middle of 2019, as a result of the transfer of the mortgage loan from Ocwen to its subsidiary PHH, Plaintiffs' mortgage payments were delayed. Fortunately, Plaintiff Donald Dunn's status as an active-duty member of the armed services protected him from foreclosure.

40. Plaintiffs decided to sell the Property, in part due to increased prices to repair the Property.

41. On or around November 1, 2019, Plaintiffs accepted an offer to sell and entered into a contract to sell the Property for $87,000, which was scheduled to close in December 2019.

42. Plaintiffs requested a payoff statement from Defendant which Plaintiffs needed in order to close the sale on the Property.

43. Promptly following the decision to sell the Property, Plaintiffs notified PHH that they were selling the property (and provided PHH with a copy of the signed contract of sale), that the closing date for the sale of the Property was scheduled for December 17, 2019, that Plaintiffs were not completing repairs to the Property, and that the purchaser had agreed to buy the Property with the remaining unrepaired damage. Plaintiffs further requested that the restricted escrow holding the insurance proceeds in the amount of $45,355.14 be applied to the mortgage principal.

7

44. Pursuant to Plaintiffs' request, on or around November 05, 2019, Plaintiffs received a payoff statement that did not list the remaining balance of the insurance proceeds. The statement showed a total payoff amount of $125,828.05, $38,828.05 more than the price at which Plaintiffs agreed to sell their home.

45. Noting the error, Plaintiffs again requested a payoff letter that reflected the accurate amount of indebtedness which would reflect the remaining insurance proceeds.

46. Defendant sent Plaintiffs a payoff letter dated November 11, 2019, which indicated a payoff amount of $125,579, again failing to include the insurance proceeds.

47. Plaintiffs made more attempts to obtain accurate payoff statements, but Defendant continued sending payoff statements that did not list the insurance proceeds.

48. Defendant sent Plaintiffs a payoff letter dated December 4, 2019, which indicated a payoff amount of $126,734.80, again failing to include the insurance proceeds.

49. After multiple phone inquiries and attempts to obtain accurate payoff requests, Plaintiffs submitted an Error Resolution Notice pursuant to 12 C.F.R. §1024.35, dated December 20, 2019.  By this point, Defendant had sent Plaintiffs several payoff statements, none of which included the insurance proceeds.

50. The notice included Plaintiffs' names, mortgage loan account number, and statement explaining Defendant's failure to provide an accurate payoff balance amount.

51. Defendant did not send Plaintiffs acknowledgment of their written request within the seven-day period provided by statute but instead cancelled the loan modification and continued to refuse to include the requested insurance proceeds in the loan balance.

52. Defendant's failure to comply with its disclosure requirements and Plaintiffs' request forced Plaintiffs to delay closing on the Property, causing them to incur costs.  Plaintiffs have suffered an ascertainable loss as a result of the delay in the sale of their home caused by Defendant's conduct, including the payment of property insurance, property tax, and interest payments that they would not otherwise have had to pay had Defendant properly included the insurance proceeds in the payoff statements.

53. Also, following the receipt of the Error Resolution Notice dated December 20, 2019, Defendants cancelled Plaintiffs' loan modification.

**Consumer Financial Protection Bureau Complaint**

54. Because of Defendant's repeated failure to provide an accurate payoff letter and Plaintiffs' need for an accurate payoff statement in order to complete the closing on his sale of the Property, Plaintiffs filed a complaint on December 20, 2019 with the CFPB regarding PHH's failure to provide a payoff statement that included the insurance proceeds. Plaintiffs filed a second complaint with the CFPB regarding the cancellation of the loan modification and PHH's failure to provide a payoff statement that included the insurance proceeds.

55. Defendant responded to the CFPB complaint on January 15, 2020.

56. Defendant admitted that Plaintiffs' request for a payoff letter which included the insurance claim funds balance caused the loan modification process to close and Defendant admitted that such closure was an "error" and "reversed the modification denial as of January 15, 2020."

57. Defendant's response also included the following statements:

> Because funds received as a result of an insurance claim are intended for repairs to a damaged property, this amount is not calculated into a payoff quote. However, we can confirm that the current claim funds balance of $45,355.14 may be deducted from the amount required to pay the loan in full, should you choose to do so. To enable us to apply these funds toward the payoff balance, an affidavit must be completed expressing your intention to utilize the funds toward payoff.

58. On January 15, 2020, Defendant forwarded correspondence including a fourth payoff letter dated January 7, 2020. The payoff statement was itemized as follows: $117,920.33 in unpaid principal balance; $5,706.49 in interest; $3,189.24 in escrow overdraft; $69.90 in unpaid late charges; $50 in unpaid returned payment charges; $395 of recoverable balance and a $10 recording fee for a total of $127,340.96 to pay the loan in full by January 31st, 2020. Defendant's January payoff statement did not include the $45,355.14 in insurance proceeds remaining, which were potentially available in whole or in part as a credit against Plaintiff's debt.

59. In the January 15, 2020 correspondence Defendant also included a form affidavit where Plaintiffs could check a box, have it notarized, and authorize Defendant to apply the insurance claim funds towards the outstanding loan amount.

60. Despite repeated requests to Defendant for a payoff statement which accurately reflected the amount due to pay off the mortgage loan, it was only after Plaintiffs had filed a complaint against Defendant with the CFPB that Defendant attempted to address Plaintiffs' requests.

**Defendant's Deceptive Practices**

61. The deceptive nature of this omission in the payoff statement is exacerbated by additional factors created by Defendant:

62. *First*, Defendant cautions Plaintiffs in the payoff statement that "THIS STATEMENT REFLECTS THE TOTAL AMOUNT DUE UNDER THE TERMS OF THE NOTE/SECURITY INSTRUMENT THROUGH THE CLOSING DATE, WHICH IS 01-31-20." (Emphasis in original.) Defendant, however, fails to advise Plaintiffs the flip-side of this statement: in light of Plaintiff's restricted escrow balance of $45,355.14, the amount owed may, in fact, be less than the stated total amount on January 07, 2020: $127,365.96.

63. *Second*, Section 5 of the mortgage agreement clearly states that insurance proceeds would be applied to the loan if restoration or repair is not economically feasible or Lender's security would be lessened. Further, Plaintiffs had notified Defendant of the contract to sell the Property and requested that the restricted insurance proceeds be applied to the mortgage balance. In its response to the CFPB complaint, PHH states that Plaintiffs' request for a payoff letter, "inadvertently triggered a short sale review, which caused the loan modification process to close." The itemized payoff statement during this review would have to reflect the outstanding loan amount with the insurance proceeds applied. The payoff statement, however, does not include this information, conveying the false and misleading implication that the restricted escrow funds have no bearing on Plaintiff's obligations under his mortgage loan.

64. *Third*, the precision of the other information included in the payoff statement, such as showing the principal, interest, escrow, and other fees due, with accuracy up to the cent,

10

conveys the misleading impression that the payoff statement describes a complete and accurate picture of the remaining amount of Plaintiffs' mortgage loan.

65. Defendant's failure to account for the insurance payments frustrated Plaintiffs' ability to close on the sale of the Property and caused them to sustain pecuniary loss in the form of, *inter alia,* the payment of property insurance, property tax, and mortgage and interest payments that they would not otherwise have had to pay had Defendant properly included the insurance proceeds in the payoff statements.

66. After a month's delay of the closing, Defendant finally sent Plaintiffs a statement including the insurance proceeds in January 2020 and, following the sale of the Property, issued a Satisfaction of Mortgage on February 19, 2020.

## CLASS ALLEGATIONS

67. Plaintiffs bring this suit as a class action on behalf of themselves and on behalf of others similarly situated pursuant to Federal Rules of Civil Procedure, rules 23(a), 23(b)(2), and/or 23(b)(3) (the "Class"). The proposed Class consists of:

> all borrowers that have or had mortgages serviced by Defendant, on property located within the United States, (i) who may receive or are entitled to receive payoff statements; or (ii) who have received mortgage payoff statements from Defendant, which failed to disclose the amount of insurance proceeds held by Defendant.

68. The members of the Class are so numerous that joinder is impracticable. Consumer reports describe PHH as focusing solely on home loans servicing $226 billion in loans in 2015.

69. Plaintiffs' claims are typical of the claims of the entire Class because Defendant failed to account for insurance proceeds in its payoff statement to Plaintiffs. Defendant has a common course of conduct of failing to account for such funds in payoff statements regarding other Class members.

70. Plaintiffs will fairly and adequately represent and protect the interests of the other Class members for purposes of Fed. R. Civ. P. 23(a)(4). Plaintiffs have no interests antagonistic to those of other Class members. Plaintiffs are committed to the vigorous

prosecution of this action and have retained counsel experienced in litigation of this nature to represent them.

71. Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2) because Defendant has acted on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

72. Class certification is appropriate under Fed. R. Civ. P. 23 (a) and 23(b)(3) because questions of law and fact are common and exist as to all members of the Class and predominate over any questions affecting only individual members of the Class, including, but not limited to:

(a) whether Defendant's practice of omitting any reference to unused insurance proceeds in its payoff statements violates TILA and its implementing regulations;

(b) whether Defendant's refusal to account for unused insurance proceeds in its payoff statements violates N.J.S.A. § 56:8-1, *et seq.*;

(c) whether Defendant fails to provide homeowners with accurate balance information; and

(d) the nature and extent of any other relief that should be provided.

73. Class certification under Fed. R. Civ. P. 23(b)(3) is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged. Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

74. Class action is also appropriate as Congress intended class actions to be a principal enforcement mechanism under TILA (*See* 15 U.S.C. § 1640(a)(2)(B)) and NJCFA because New Jersey courts have endorsed the use of class actions in the context of NJCFA where consumers seek to redress a common injury under circumstances that would make individual actions uneconomical to pursue.

75. Class members have suffered and will suffer irreparable harm and damages as a result of Defendant's wrongful conduct.

## COUNT I

### (Violation of TILA and Regulation Z)

76. Plaintiffs repeat the allegations in the above paragraphs as if fully set forth herein.

77. Defendant's failure to account for insurance payments in its payoff statements has the effect of overstating and exaggerating Plaintiffs' obligation under the Mortgage, and thus constitutes an "[in]accurate statement of the total outstanding balance that would be required to pay the consumer's obligation in full" (12 C.F.R. § 1026.36(c)(3)) and an "[in]accurate payoff balance" (15 U.S.C. § 1639g).

78. Consequently, Defendant's payoff statement is in violation of TILA and Regulation Z.

79. Failure to account for insurance payments in payoff statements imposes drastic consequences upon the recipient Class members, such as Plaintiffs.

80. A homeowner is unable to proceed with the closing of his or her home without an accurate payoff statement from a servicer, leading to additional costs where a borrower is attempting to satisfy a debt.

81. Additionally, the exaggerated debt also has the potential to adversely impact the credit ratings of Plaintiffs and the members of the Class. Defendant's conduct has the effect of "impeding consumers from refinancing existing loans." 73 Fed. Reg. at 1702.

82. Defendant's deceptive payoff statements exaggerate the amounts owed, frustrating efforts to conclude contracts of sale, as in Plaintiffs' situation, and obstructing the Class' efforts to meet its loan obligations otherwise.

## COUNT II

### (Violation of the New Jersey Consumer Fraud Act)

83. Plaintiffs repeat the allegations in the above paragraphs as if fully set forth herein.

84. Plaintiffs and other members of the class are "persons" within the meaning of N.J.S.A. § 56:8-1(d).

85. Defendant's conduct alleged herein constitutes a "sale" within the meaning of N.J.S.A. § 56:8-1(e).

86. Defendant's mortgage servicing services constitute "merchandise" within the meaning of N.J.S.A. § 56:8-1(c).

87. Defendant's practices relating to the omission of insurance proceeds from payoff statements constitute an "unconscionable commercial practice, deception, fraud … [and] misrepresentation" in connection with its mortgage servicing as defined by N.J.S.A. § 56:8-2. Further, as a result of Defendant's violating federal law, TILA and Regulation Z, the actions of PHH complained of herein constitute an unconscionable commercial act.

88. As a result of Defendant's practices, Plaintiffs have suffered an ascertainable loss, including the delayed sale of their home, and principal, interest, tax and insurance payments they otherwise would have saved if Defendant properly included the insurance proceeds in the payoff statements.

89. As redress for Defendant's repeated and ongoing violations of NJCFA, Plaintiffs and the Class are entitled to treble damages pursuant to N.J.S.A. § 56:8-19.

90. Further, Plaintiffs are entitled to court costs and reasonable attorneys' fees in connection with this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all members of the Class, pray for relief as follows:

A. Determining that this action may proceed as a class action under Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, appointing Plaintiffs as class representatives, Plaintiffs' counsel as counsel for the Class, and directing that proper notice be distributed to the Class;

B. Awarding damages pursuant to 15 U.S.C. § 1640(a)(1), 15 U.S.C. § 1640(a)(2)(A)(iv), and 15 U.S.C. § 1640(a)(2)(B), together with prejudgment interest;

      C.      Enjoining Defendant from future violations and directing Defendant to include on all future payoff statements any insurance payments held by it;

      D.      Awarding treble damages pursuant to N.J.S.A. § 56:8-19;

      E.      Awarding reasonable attorneys' fees and costs, including experts' fees; and

      F.      Granting such other and further relief, in law or equity, as this Court may deem appropriate and just.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury for all matters so triable.

Dated:  May 12, 2020

                                COHN LIFLAND PEARLMAN
                                HERRMANN & KNOPF LLP
                                *Counsel for Plaintiffs and the Class*

                                By: <u>s/ Jeffrey W. Herrmann</u>
                                    Jeffrey W. Herrmann
                                    A Member of the Firm

<u>Of Counsel:</u>
Patricia I. Avery
Timothy Brennan
**WOLF POPPER LLP**
845 Third Avenue, 12th Floor
New York, NY 10022
Telephone:  (212) 759-4600
Email: pavery@wolfpopper.com
        tbrennan@wolfpopper.com